UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MATTHEW GABRIEL, both individually and
as Administrator of the Estate of MICHAEL
DICAMILLO,

                              Plaintiff,

       -v-                                                08-CV-0064

COUNTY OF HERKIMER; CHRISTOPHER
FARBER; THOMAS MCGRAIL; L. T.
CODDINGTON; CHARLENE MACRI; Registered
Nurse SHANNON URTZ; Registered Nurse
CHRIS FULLEM; Corrections Officer MICHAEL
ORTLIEB; and Corrections Officer JOAN SMITH;

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

COUNTY OF HERKIMER and CHRISTOPHER
FARBER,

                       Third-Party Plaintiffs,

       -v-

LITTLE FALLS HOSPITAL,

                       Third-Party Defendant,

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                              OF COUNSEL:

OFFICE OF ELMER R. KEACH, III             ELMER R. KEACH, III, ESQ.
Attorneys for Plaintiff
1040 Riverfront Center
P.O. Box 70
Amsterdam, NY 12010

MURPHY, BURNS, BARBER & MURPHY, LLP          THOMAS K. MURPHY, ESQ.
Attorneys for County Defendants and Third-
    Party Plaintiffs
226 Great Oaks Boulevard
Albany, NY 12203

WILSON ELSER MOSKOWITZ EDELMAN          JOSEPH T. PERKINS, ESQ.
    & DICKER LLP          THERESA B. MARANGAS, ESQ.
Attorneys for Defendant Macri and Third-Party          ELIZABETH J. GROGAN, ESQ.
    Defendant Little Falls Hospital
677 Broadway, 9th Floor
Albany, NY 12207

DAVID N. HURD
United States District Judge

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 4 -

FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 4 -
     Friday, June 23–Monday, June 26, 2006. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 5 -
     Tuesday, June 27, 2006. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 9 -
     Wednesday, June 28, 2006. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 11 -
     Thursday, June 29, 2006. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 12 -
     Friday, June 30, 2006. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 19 -
     New York State Commission of Correction Report. . . . . . . . . . . . . . . . . . . . . . . . - 22 -

PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 24 -

LEGAL STANDARD—SUMMARY JUDGMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 25 -

DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 26 -
     Hospital Defendants' Motion for Summary Judgment. . . . . . . . . . . . . . . . . . . . . . - 26 -
          Claims against N.P. Macri. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 26 -
               Deliberate Indifference:  Federal Claim. . . . . . . . . . . . . . . . . . . . . . . - 26 -
               Punitive Damages. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 32 -
          Third-Party Complaint against the Hospital. . . . . . . . . . . . . . . . . . . . . . . . . - 32 -
     County Defendants' Motion for Summary Judgment. . . . . . . . . . . . . . . . . . . . . . . - 33 -
          R.N. Urtz. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 33 -
          Deliberate Indifference:  Federal Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . - 34 -
               R.N. Fullem. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 35 -
               C.O. Ortlieb and C.O. Smith. . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 38 -
               Herkimer County. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 39 -
               Personal Involvement of Sheriff Farber, Cpt. McGrail,
                  and Lt. Coddington. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 44 -
               Qualified Immunity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 48 -
          Violation of Due Process:  Federal Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . - 49 -
          Wrongful Death:  State Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 51 -

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . - 53 -

**MEMORANDUM-DECISION and ORDER**

I. **INTRODUCTION**

Plaintiff Matthew Gabriel ("plaintiff" or "Gabriel"), brought this action both individually and as Administrator of the Estate of Michael DiCamillo ("DiCamillo" or "decedent") against defendants County of Herkimer (the "County"); Christopher Farber ("Sheriff Farber"); Thomas McGrail ("Cpt. McGrail"); L. T. Coddington ("Lt. Coddington"); Registered Nurse Shannon Urtz ("R.N. Urtz"); Registered Nurse Chris Fullem ("R.N. Fullem"); Corrections Officer Michael Ortlieb ("C.O. Ortlieb"); Corrections Officer Joan Smith ("C.O. Smith") (collectively "County defendants"); and Nurse Practitioner Charlene Macri ("N.P. Macri").  Plaintiff asserts a federal law claim on behalf of the Estate for deliberate indifference to DiCamillo's serious medical needs under 42 U.S.C. § 1983; a federal law due process claim brought by plaintiff individually under 42 U.S.C. § 1983; and a state law wrongful death claim on behalf of the Estate.

Currently pending are two motions for summary judgment brought by defendants. Oral argument was heard on March 26, 2012, in Utica, New York.  Decision was reserved.

II. **FACTUAL BACKGROUND**

Unless otherwise noted, the following facts are viewed in the light most favorable to plaintiff, the non-movant, as must be done on a summary judgment motion.

In 2006 and at all relevant times, the County and Sheriff Farber contracted with Little Falls Hospital (the "hospital") to provide medical services at the Herkimer County Jail (the "jail").  See Perkins Aff., July 15, 2011, Ex. W, Dkt. No. 123–27 ("Agreement").  Pursuant to the Agreement, the hospital provided the services of N.P. Macri and her collaborating physician, Dr. Luke Handy ("Dr. Handy").  As part of her duties under the Agreement, N.P.

Macri visited the jail on Thursdays from approximately 11 a.m. to 2 p.m. to evaluate new

detainees and provide medical treatment to all prisoners.

### A.  <u>Friday, June 23–Monday, June 26, 2006</u>

On Friday, June 23, 2006, DiCamillo was arrested by the Herkimer Police Department

and charged with Resisting Arrest.[1]  He was arraigned in Herkimer Village Court and

remanded to the jail that same day.

DiCamillo arrived at the jail booking office with a box full of numerous, loose

medications.  During intake, he advised jail staff that he suffered from alcohol dependency

issues, drug addiction, mental health problems, high blood pressure, and heart problems,

and was receiving treatment for back and heart illnesses.  He identified Dr. Sperling as his

primary care physician and Dr. Zoppa as his psychiatrist.  His medical history form indicated

he was on a variety of prescription medications including anti-depressants, pain killers, and

muscle relaxers.  <u>See</u> Keach Affirm., Nov. 7, 2011, Ex. 49, Dkt. No. 137–24 ("Medical History

Form").  The physician and pharmacy identified by DiCamillo were contacted and information

regarding his various prescriptions was obtained.  DiCamillo was prescribed the following

medications:  Clonazepam 2mg, four times a day; Toprol XL 100mg, once a day;

Temazepam 30mg, at bedtime; Avinza 120mg, once a day; Cyclobenzaprine (Flexeril) 5mg,

twice a day; Effexor XR 150 mg, four times a day; Nortriptyline 50mg, at bedtime; Buspirone

---

[1]  When DiCamillo later appeared in court on June 28, 2006, the Assistant District Attorney
mentioned that there was also another related charge pending.

10mg, three times a day; Aciphex 20mg, once a day; Topamax 100mg, twice a day; Skelaxin 800mg, twice a day; Lactulose 10g, twice a day; and Albuterol inhaler, as needed.[2]

That same evening, R.N. Urtz conducted an initial intake and performed a nursing assessment.  Her assessment form indicated DiCamillo had a past history of depression, anxiety, tachycardia, angina, mitral valve prolapse, high blood pressure, degenerative back disease, and sciatic nerve problems.  Id., Ex. 48, Dkt. No. 137–23 ("Inmate Nursing Assessment").  DiCamillo informed her he was also suffering from "brain atrophy" due to his past alcohol and drug abuse, but was drug and alcohol abuse free for ten years.  Id.  R.N. Urtz reviewed DiCamillo's entire list of medications, which consisted of approximately thirteen prescription drugs including three narcotics.[3]  She contends DiCamillo confirmed he was currently taking each of the drugs as prescribed, the only exception being Zyrtec, which DiCamillo indicated he only took seasonally.[4]

Plaintiff disputes that R.N. Urtz independently confirmed all of the medications with DiCamillo, noting that the medication list is in a different handwriting than R.N. Urtz's other notes; medical records from Dr. Sperling were not requested until Tuesday, June 27, 2006—

---

[2]  Generally, DiCamillo's prescriptions have the following uses:  Clonazepam is an anti-seizure medication; Toprol XL treats hypertension; Temazepam treats insomnia; Avinza is morphine and is used for the treatment of moderate to severe pain; Cyclobenzaprine (Flexeril) is a muscle relaxant; Effexor XR treats depression and anxiety; Nortriptyline is an anti-depressant; Buspirone is an anti-anxiety medication; Aciphex treats acid reflux and heartburn; Topamax is an anti-seizure medication; Skelaxin is a muscular analgesic used to relieve the discomforts associated with acute, painful musculoskeletal conditions; Lactulose is a laxative; and Albuterol is used to treat asthma.  See Concise Monographs for each drug, Physicians' Desk Reference, PDR.net.

[3]  According to R.N. Urtz, she did not call the pharmacy nor Dr. Sperling to verify DiCamillo's medications, nor does she regularly do so because the pharmacies are often closed by the time she arrives at the jail in the evenings.  She contends C.O. Heidi Broadbent called earlier in the day and a list of DiCamillo's confirmed medications was faxed to the jail.

[4]  This was noted in the chart and the Zyrtec was not ordered.

three days later; and that it was likely apparent DiCamillo was not compliant with a medication regimen since he arrived at the jail with a shoebox of loose medicines.

After R.N. Urtz's assessment and pursuant to jail policy, she called N.P. Macri to provide N.P. Macri with her nursing assessment, review DiCamillo's list of medications, and receive N.P. Macri's orders regarding his prescriptions.[5]  R.N. Urtz contends she advised N.P. Macri about DiCamillo's physical and mental health issues, as well as his entire list of prescription medications that were confirmed with DiCamillo, his physician, and his pharmacy.  N.P. Macri responded "Oh my God, you're kidding me" to the list of medications. See Keach Affirm., Nov. 7, 2011, Ex. 26 at 92:18–20, Dkt. No. 137–1 ("Macri Tr.").

N.P. Macri advised R.N. Urtz to order and dispense the medications to DiCamillo if they were all confirmed.  N.P. Macri noted that if DiCamillo had been taking the drugs in the prescribed amounts for many years as he reported, she did not want to change his medications in any way that might cause a problem for him.  On N.P. Macri's orders, all medications except for the narcotics were ordered that day from the jail's drug supplier. Pursuant to jail policy, N.P. Macri contacted the supplier directly for the narcotics.  N.P. Macri confirmed with R.N. Urtz that she ordered an emergency five day supply of the narcotics by telephone for DiCamillo, which would be enough medication to carry him through Thursday of the following week (June 29, 2006) when N.P. Macri would be at the facility and would be able to order additional prescriptions for the narcotics in the event DiCamillo was still incarcerated.  Following her shift on June 23, 2006, R.N. Urtz left for an out-of-state vacation

---

[5]  R.N. Urtz had to receive approval from N.P. Macri because registered nurses cannot prescribe medications.

and did not return to the jail until July 10, 2006.  There was no nursing coverage at the jail from Saturday, June 24–Wednesday, June 28, 2006.

R.N. Urtz testified that after she left the jail on Thursday, June 23, 2006, the only involvement she had with DiCamillo's case occurred that same evening.  She was contacted by telephone by a C.O. after DiCamillo's prescriptions were delivered to the jail.  She directed the C.O. as to what medications could be given to DiCamillo that night, and which medications would have to wait and be given to him as prescribed beginning the next morning.

According to plaintiff, a nurse at the jail was required to verify that the medications received from the pharmacy matched what was ordered.  Plaintiff alleges this was not done in DiCamillo's case, and as a result, his prescription for Avinza (morphine) was improperly administered.  DiCamillo was prescribed one 120 mg pill of Avinza per day.  N.P. Macri contends she ordered the Avinza in 120 mg pills, which for a five day emergency supply would have resulted in the delivery of five-120 mg pills.  The evidence establishes that the pharmacy instead delivered the Avinza in 30 mg pills, with directions to dispense the medication in four capsules every day (for a total of 120 mg per day).  See Keach Affirm., Nov. 7, 2011, Ex. 61, Dkt. No. 138–11 ("Narcotics List"); Ex. 71, Dkt. No. 138–21 ("Medication Blister Packs").  Accordingly, the Avinza package delivered to the jail contained twenty-30 mg pills.  This is consistent with administering four-30 mg pills, once a day, for the five days for which N.P. Macri ordered the prescription.

Plaintiff alleges that the change in packaging (30 mg pills instead of 120 mg pills) was not noticed by jail staff, and as a result, instead of receiving one 120 mg pill per day, DiCamillo received one 30 mg pill for the first three days he was at the jail.  This is consistent

with the records.  The Narcotics List indicates that on June 24, 25, and 26, DiCamillo only received one-30 mg pill of Avinza per day.

Plaintiff contends that DiCamillo made numerous attempts to let jail staff know that his medications were wrong.  Specifically, on June 24 DiCamillo submitted a sick slip to jail staff stating "Where is my Avinza."  See Keach Affirm., Nov. 7, 2011, Ex. 67, Dkt. No. 138–17 ("sick slips").  The sick slip also mentioned his increased back pain, due to the fight he was involved in prior to his arrest, and requested a cane for walking.  On June 25, DiCamillo submitted another sick slip advising that he was not taking his proper medications and reiterating his request for a cane.  Id.

### B.  Tuesday, June 27, 2006

DiCamillo again requested a cane on Tuesday.  Lt. Coddington advised that a cane would be permitted if deemed medically necessary, but that it presented a security issue.  As a result, an inmate using a cane must be confined to a small block with less inmates than the 3 South block where DiCamillo was being housed.  Lt. Coddington directed that N.P. Macri be contacted regarding DiCamillo's need for a cane, and further directed that DiCamillo be moved to a smaller block in anticipation that he might be approved for the cane.  After DiCamillo was advised of this, he stated that he did not need a cane and would not move cell blocks.

The record establishes that the mistake with the Avinza was noticed on Tuesday, but is unclear who noticed the mistake and whether it was brought to the attention of a nurse.

C.O. Broadbent, cross-designated as a medical officer,[6] was working on Tuesday.  She testified that she believed she noticed the mistake and brought it to the attention of the nurse on duty.  She did not recall which nurse it was, or whether she communicated this information in writing or orally.  R.N. Urtz was out on vacation at this time, and records establish that R.N. Fullem did not work on Tuesday.  It is undisputed that the mistake was not brought to the attention of N.P. Macri nor Dr. Handy.  Records establish that beginning on Tuesday, jail staff abruptly increased DiCamillo's Avinza dose to the proper dosage of four-30mg pills, for a total of 120 mg a day.  This was done without the oversight of a nurse or physician.

Plaintiff alleges additional inconsistencies with the administration of DiCamillo's prescriptions on Tuesday, June 27.  For example, the Security Log indicates that DiCamillo was administered medication only two times on June 27:  at 8:30 a.m. and at 1:15 p.m..  See Keach Affirm., Nov. 7, 2011, Ex. 72, Dkt. No. 138–22 ("Security Log").  The Medication Administration Record, however, indicates DiCamillo was also administered Busparone and Temazapam at 11:30 p.m., but was not given the 11:30 p.m. dose of Nortriptyline as prescribed.  See id., Ex. 60, Dkt. No. 138–10 ("Medication Administration Record").[7]  The

---

[6]  The jail had a policy of cross-designating C.O.s as "Medical Officers."  The policy states: "On every shift there will be at least one Deputy serving as the Medical Officer. This Deputy has received training in limited aspects of health care as determined by the facility physician. The Medical Officer maintains close liaisons with the Nurse and Physician. He/she is responsible for distributing medication as directed by the physician or his designee. The Medical Officer serves as a health service provider at the times when the Nurse and/or physician are not present."  Keach Affirm., Nov. 7, 2011, Ex. 122.

[7]  Plaintiff's exhibits 59 and 60 are both Medication Administration Records; exhibit 59 is labeled as that of the hospital's, while exhibit 60 is labeled as that of the jail's.  According to plaintiff's counter-statement of material facts, the quantities of medications administered to DiCamillo are different in the two documents, demonstrating the jail's inaccurate medical record documentation practices and inaccurate medication administration practices.  Except to point out these discrepancies, plaintiff only references exhibit 59.

Narcotics List also indicates DiCamillo was administered an 8:30 p.m. dose of Clonazepam but this was not documented in the Security Log or the Medication Administration Record.

Testimony from other inmates at the jail indicates that DiCamillo complained to C.O.s, nurses, and other inmates that he was not being given the right medication and/or that he was being given too much of it.  Specifically, Matt Reel, an inmate housed with DiCamillo, testified that DiCamillo complained to R.N. Fullem three days before his death that jail staff were giving him the wrong medication or too much medication.  See, e.g., id., Ex. 33 at 19–21, Dkt. No. 137–8 ("Reel Tr.").  Reel contends that R.N. Fullem advised DiCamillo that he would check on his prescriptions.  According to Reel, DiCamillo asked jail staff to see his outside nurse or doctor but was advised it was not possible and that R.N. Fullem was the nurse on duty.

## C. Wednesday, June 28, 2006

Plaintiff alleges that DiCamillo started showing signs of drug intoxication on Wednesday, June 28, one day after his Avinza was abruptly increased.  Those symptoms included sweating profusely, confusion, sudden falling, being unable to stand on his own, and extreme lethargy.  C.O. Andrew George observed DiCamillo sitting on the floor, sweating profusely, with his eyes almost shut.  See id., Ex. 19 at 24:10–14, Dkt. No. 136–19 ("George Tr."); Murphy Aff., July 15, 2011, Ex. D at 9, Dkt. No. 125–5 ("Tower Log").  C.O. George also later told investigators that DiCamillo looked like someone poured a cup of water on his head; that it was hot that day; and that DiCamillo "looked out of it."  George Tr. at 55:16–56:2.  When C.O. George asked DiCamillo if he was okay, DiCamillo responded "I'm all right."  Id. at 24:10–14.  Approximately three and a half hours later, at 3:30 p.m., C.O.

George observed DiCamillo leave the jail for a court appearance.  Id. at 57:9–18.  According to C.O. George, DiCamillo appeared to be walking fine at that point.  Id.

Plaintiff also alleges DiCamillo was improperly administered his prescriptions on June 28.  Specifically, the Narcotics List indicates DiCamillo was given a 4:30 p.m. dose of Clonazepam by Sergeant James Drake, but the Medication Administration Record indicates that dose was not administered.  The Medication Administration Record for June 28 also indicates that DiCamillo was not administered his 4:30 p.m. doses of Effexor and Busparone.

### D.  Thursday, June 29, 2006

On Thursday, June 29, 2006, between approximately 8:00–8:30 a.m., C.O. Sydney Renshaw observed DiCamillo crawling out of his cell trying to get up off the floor.  C.O. Rensaw inquired with DiCamillo if he was okay, to which DiCamillo responded, yes he just wanted a drink of water.  C.O. Renshaw helped DiCamillo sit on a bench and got him a cup of water.  DiCamillo advised jail staff that he had a hard time getting up, particularly in the morning due to his medical condition, and that he did not want to take a chance of falling and that was why he was crawling out of his cell.  C.O. Renshaw contacted the medical unit to request a medical check of DiCamillo.  C.O. Renshaw testified that at this time, DiCamillo was coherent, not slurring his speech, and his eyes were open.

R.N. Fullem received the call from C.O. Renshaw and arrived to check on DiCamillo.  R.N. Fullem had previously been informed that DiCamillo was on a large number of medications.  R.N. Fullem took DiCamillo's vital signs which were normal.  DiCamillo stated that it takes him awhile to get going in the morning, that he had extensive back problems, and that this was normal for him.  R.N. Fullem testified that DiCamillo was coherent, able to answer his questions, and not lethargic, but was sweating a little bit.  R.N. Fullem did not

document this interaction with DiCamillo as required by jail policies and professional licensing standards.

Meanwhile, N.P. Macri arrived at the jail at approximately 10 a.m..  At some point that morning, she reviewed DiCamillo's medical file.  R.N. Fullem testified that he advised N.P. Macri that C.O. Renshaw observed DiCamillo crawling across the floor earlier in the morning and he had difficulty getting up, to which N.P. Macri inquired about DiCamillo's vital signs. R.N. Fullem explained his assessment to N.P. Macri, who informed R.N. Fullem that DiCamillo would be coming to the medical unit for an initial assessment.

At some point after N.P. Macri's arrival at the jail, C.O. Gary Hadsell (the medical officer on duty) and C.O. Brian Harrod entered the 3 South block (where DiCamillo was housed) to bring inmates down for medical visits.  C.O. Hadsell attempted to summon DiCamillo, who said he was having a hard time moving and would not be able to go down to the medical unit.  DiCamillo advised C.O. Hadsell that it took him awhile—a half hour or forty minutes—to get his legs going in the morning, and that this was an everyday thing for him. Meanwhile, C.O. Harrod brought inmate Jamie Knapp to the medical unit and advised R.N. Fullem of DiCamillo's condition.  R.N. Fullem told C.O. Harrod to assist DiCamillo so he could get to the medical unit.

When C.O. Harrod returned to DiCamillo's block, he and C.O. Hadsell attempted to stand DiCamillo up with no success.  They offered him a wheelchair but he refused.  He stated that if he could not get to the medical unit on his own without the use of a wheelchair, he was not going.  C.O. Hadsell testified that DiCamillo did not say "I wouldn't go down," he said "I can't go down" to the medical unit.  See Keach Affirm., Nov. 7, 2011, Ex. 20 at 32:21–22, Dkt. No. 136–20 ("Hadsell Tr.").  He also testified that he never told anyone that

DiCamillo refused to see the nurse.  C.O. Harrod phoned R.N. Fullem to advise DiCamillo would not be coming down.

According to R.N. Fullem, the reason for DiCamillo's inability to get to the medical unit was relayed to him in the presence of N.P. Macri.  C.O. Harrod testified that he did not speak with N.P. Macri directly and did not know whether she knew that DiCamillo was having trouble walking or getting up.  However, C.O. Harrod later testified that he advised R.N. Fullem of this information in the presence of N.P. Macri.

R.N. Fullem further testified that DiCamillo's cell was approximately sixty to seventy feet away from the medical unit, and that he suggested to N.P. Macri that they go to see him in his cell, to which N.P. Macri responded that she would see him the following Thursday. Despite being aware of DiCamillo's inability to ambulate to the medical unit, N.P. Macri documented his inability to see her as a "refusal."  Jail policy dictates that if an inmate refuses medical treatment, they must fill out a refusal form.[8]  DiCamillo was never given a refusal slip to sign and N.P. Macri testified that she did not know why she did not make him sign a refusal slip.

N.P. Macri testified that she was never advised that DiCamillo could not get up and was unable to walk.  She also denies that R.N. Fullem told her that he had observed DiCamillo earlier in the day having difficulty getting up.  She testified that around the time of these events, she was in the medical unit signing charts and a C.O. was speaking to R.N. Fullem.  According to her, she was told that DiCamillo refused to come down.  Then someone in the room made the comment, "We can make him come down," to which she

---

[8] For example, earlier in the week, a refusal slip was filled out when DiCamillo refused to take the Albuterol given to him.

replied, "No, no, no.  That's okay.  He can refuse."  Macri Tr. at 279:10–16.  N.P. Macri then left the jail at some point after 11:00 a.m..

At 11:08 a.m., a phone called was placed by a male C.O. to R.N. Fullem advising that DiCamillo "ain't getting up."  Keach Affirm., Nov. 7, 2011, Ex. 123 at 55:4, Dkt. No. 140–23 ("Tr. Telephone Calls").  The male C.O. advised that DiCamillo was "farther on the floor now than he was when I left."  Id. 55:14–15.  R.N. Fullem advised that N.P. Macri "wants to review his meds and possibly discontinue them because he's so groggy."  Id. 55:19–21.  Another phone call was placed by a male C.O. to R.N. Fullem at 11:41 a.m. stating "Chris, what are they going to do about DiCamillo?  He's right out of it.  He's right on the floor up here."  Id. at 59:3–5, Dkt. No. 140–23.  R.N. Fullem advised he would check on DiCamillo, to which the male C.O. responded, "There's something wrong.  He ain't right."  Id. 59:7–8.

When R.N. Fullem arrived to check on DiCamillo at 11:54 a.m., DiCamillo was sitting on the floor of his cell.[9]  R.N. Fullem testified that DiCamillo's vitals were normal, he was alert and oriented, and answered his questions appropriately.  Following that visit, R.N. Fullem filled out a nursing note detailing DiCamillo's vital signs and current state.

At 11:58 a.m., R.N. Fullem contacted Eckerd pharmacy to confirm DiCamillo's medications.  The audio recording of that call indicates R.N. Fullem advised the pharmacist he was a nurse from the jail and stated, "I'm just trying to verify some meds on a huge guy I got over here.  It says they were verified, but it seems like he's on an awful lot."  Id. 61:2–5.

_____

[9]  C.O. Renshaw testified that at approximately 11:45 a.m., he observed an extra lunch tray on the table in the day room and inmates pointed him in the direction of DiCamillo's cell.  C.O. Renshaw discovered DiCamillo sitting on the floor of his cell.  He inquired if DiCamillo wanted to eat his lunch, to which he said no.  C.O. Renshaw then delivered a drink to DiCamillo, removed the lunch tray, and exited the block.  He testified that DiCamillo's condition was the same as it was at approximately 8:00 a.m. that morning—he was coherent, and his eyes and speech were normal.

After the pharmacist listed DiCamillo's prescribed medications, she stated "He's on so much stuff and he really does take two muscle relaxants and the whole bit," to which R.N. Fullem responded "Unbelievable" and the pharmacist stated "Yep.  It's unreal."  Id. 63:20–24.  R.N. Fullem testified he made the call because DiCamillo's medications were numerous, and because he was concerned they may not have been correctly transcribed.  The pharmacist advised of two medications prescribed to DiCamillo—Paxil and Nexium— which the jail did not order nor administer to DiCamillo.  Despite this discrepancy, R.N. Fullem did not make any further inquiry.

        At 1:45 p.m., recreation time was announced.  All inmates went except for DiCamillo. R.N. Fullem testified that he checked on DiCamillo for a third time at 1:45 p.m. because he knew there would not be any medical coverage at the jail for the next twenty four or forty eight hours, or possibly longer because there was no full-time nurse employed by the jail. According to R.N. Fullem, DiCamillo was again alert and oriented, his vital signs were good, and DiCamillo advised that his present state was "normal for him."  Again, R.N. Fullem failed to document the interaction as required by jail policies and professional licensing standards.

        R.N. Fullem testified that at no time during his three interactions with DiCamillo on June 29 did DiCamillo complain to him about his medications.  Plaintiff disputes this and contends inmate Matt Reel heard DiCamillo complain to R.N. Fullem that he was receiving either the wrong medication or too much medication, to which R.N. Fullem responded that he would check to see whether his medications were correct.  R.N. Fullem testified that he called the pharmacy to confirm DiCamillo's medications because of the extent of the medications coupled with what the C.O.s had reported to him regarding DiCamillo's inability to get off the floor.  Based on this, R.N. Fullem testified that he thought that maybe

something was transcribed wrong, so he called the pharmacy to double check just to be on the safe side.  R.N. Fullem also testified that on June 29, he reviewed one of DiCamillo's sick slips which stated he was not receiving the right medications.  Finally, R.N. Fullem was aware that N.P. Macri planned on reviewing DiCamillo's medications and possibly decreasing or discontinuing some of them because he was "so groggy."  Telephone Tr. 55:19–21.

At 2:58 p.m., C.O. Harrod telephoned R.N. Fullem.  C.O. Harrod advised that an inmate was released, and stated "That's one good thing.  If we can get rid of the other dink upstairs, we'll be all set."  Id. 66:5–9.  R.N. Fullem replied, "I know it."  Id. 66:10.  C.O. Harrod asked R.N. Fullem "What'd you go up there for? What's his problem now?"  Id. 66: 11–12.  It is clear from the remainder of the conversation they were referring to DiCamillo.  R.N. Fullem advised that he recently checked on DiCamillo, who had relayed that his body was challenged.  C.O. Harrod then said that DiCamillo stated "I need help" and that he and C.O. Hadsell tried to get DiCamillo up, but that they were doing all the work, and still could not stand him up.  Id. 67:3–4.  R.N. Fullem responded, "I mean, that's just manipulation, you know, I mean, because he sure the hell wasn't like this when they arrested him.  Id. 67:7–9.[10] R.N. Fullem advised that he completed a Med 6 form[11] and copied DiCamillo's medication sheets if "by some remote chance" he had to go to the hospital.  Id. 67:14–17.  He then stated that even if DiCamillo went to the hospital, all they would do is "put a liter of fluid in

---

[10]  R.N. Fullem testified that he thought DiCamillo was manipulative because when he first arrived at the jail he requested a cane.  After being advised he would have to move to a smaller block for security reasons, he no longer wanted the cane.

[11]  A Med 6 form is filled out for an inmate who is sent to a hospital, a consult for a doctor, or any other medical visit.  It contains identifying information and relevant medical history.  See Keach Affirm., Nov. 7, 2011, Ex. 66.

him and send him back."  Id. 67:17–19.  He further explained that DiCamillo was alert, oriented, and talking.

Before leaving the jail at approximately 3:00–4:00 p.m., R.N. Fullem left the completed Med 6 form in the event DiCamillo needed to go to the hospital.  The form noted DiCamillo's chief symptoms as "lethargy, altered level of consciousness."  R.N. Fullem testified that before leaving the jail, he told the people at the front desk to send DiCamillo to the hospital if he needed to go.

At 4:24 p.m., C.O. Jeff Fahey called Sergeant James Drake to advise that DiCamillo would not respond to have his pulse taken.  Id. 69:1–2.  Sergeant Drake stated that R.N. Fullem informed him DiCamillo was fine.[12]  C.O. Fahey told Sergeant Drake that DiCamillo was positioned against the wall where he could not breath and that his head was pressed against the middle of his chest.  Id. 69:12–14.  A subsequent phone call advised that DiCamillo had not eaten all day.

 Plaintiff also alleges there are inconsistencies regarding when DiCamillo was administered medication on Thursday, June 29.  According to the Medication Administration Record, he was administered medication four times on that date, while the Security Log reflects he was administered medication five times.  While the hospital's Medication Administration Record (exhibit 59) documents four occurrences, the jail's Medication Administration Record (exhibit 60) indicates medication was administered to DiCamillo a fifth time at 11:30 p.m. by the initials "JF" (presumably C.O. Jeff Fahey).  Plaintiff alleges C.O.s

---

[12]  Sergeant Drake testified that he had an earlier conversation with R.N. Fullem and was advised that was how DiCamillo regularly acted.

did not initial the jail's Medication Administration Record (exhibit 60) as required until after DiCamillo's death on Friday, June 30.

After his shift ended on the afternoon of Thursday, June 29, R.N. Fullem left the jail and had no further contact with jail employees nor DiCamillo.

### E.   Friday, June 30, 2006

C.O.s on duty Friday, June 30 were advised to keep an eye on DiCamillo.  The Security Log indicated that DiCamillo had been complaining about his ankles.  At approximately 7:20 a.m. DiCamillo fell suddenly to the floor while walking.  He sat up immediately and C.O. Jared Popiel helped him off the floor.  DiCamillo advised that his ankles were swollen and that is likely why he fell.  The medical officer (C.O. Broadbent) on duty was notified.  At 8:00 a.m., C.O. Michael Ortlieb arrived on duty.  He then took several inmates to another part of the jail for recreation time, returning to the cell block at approximately 9:40 a.m..  Meanwhile, C.O. Hadsell conducted a clock punch[13] at 9:02 a.m.. The Security Log noted that "inmate DeCamillo [sic] appears to not be feeling well says his back is bothering him; keep an eye on him."  Security Log at 24.

Surveillance video from the jail shows DiCamillo falling two more times, at 9:50 and 9:54 a.m..  C.O. Ortlieb testified that he was in the tower at the time of these falls, but did not see DiCamillo fall either time.  C.O. Ortlieb later observed DiCamillo fall again after lunch, in the dayroom area, at approximately 11:34 a.m..  C.O. Ortlieb went to assist as DiCamillo was

---

[13]  When C.O.s are assigned to a tower, they sit in an enclosed area with a window that looks into the housing units.  They are charged with monitoring the housing units and ensuring the safety and security of the facility.  Every half hour, C.O.s leave the tower and conduct a clock punch.  The purpose of a clock punch is to conduct a formal head count, make sure all the inmates are accounted for, and ensure all inmates are okay—to see if they are laying down, hurting themselves, etcetera.

on his hands and knees.  He advised that his ankles hurt but that he was okay.  C.O. Ortlieb then telephoned the medical unit.

C.O. Joan Smith, the medical officer on duty, responded to the call.  C.O. Ortlieb advised her that DiCamillo had fallen and that his ankles were swelling.  He does not recall whether he told her that DiCamillo had fallen earlier.  C.O. Smith took DiCamillo's vital signs. She testified DiCamillo said he was okay but that his legs were bothering him, giving out on him, and swelling.  Plaintiff contends DiCamillo was incapable of communicating coherently at this point.

C.O. Smith telephoned N.P. Macri (outside the facility) at 12:02 p.m. and advised that DiCamillo fell, but his vitals were good, and that she thought he was just groggy from the medications.[14]  N.P. Macri told C.O. Smith that DiCamillo refused to see her the prior day. N.P. Macri acknowledged that she personally would not even be functional on all the drugs DiCamillo was prescribed, and referenced the Flexeril, Skelaxin, and various narcotics.  C.O. Smith stated, "And he's complaining that his legs are starting to swell up a little bit, his ankles.  But I don't think we should send him.  I mean, I think it's just the medicine that's making him groggy."  Telephone Tr. 75:7–11.  N.P. Macri responded, "Yeah.  Let's hold off on the Flexeril"[15] because it would make his muscles "lax and loose."  Id. 75:12–17.  She confirmed with C.O. Smith that DiCamillo's vitals were normal, and advised her to keep an eye on him.

---

[14]  Plaintiff alleges that C.O. Smith failed to check records of DiCamillo's vitals at intake (which would have shown a change in blood pressure), did not consult the log book which showed the other problems he was having, and made no effort to learn anything about DiCamillo's medical history before calling N.P. Macri.

[15]  He had already received his morning dose.

C.O. Smith placed a note in DiCamillo's medical file stating:  "Inmate DiCamillo fell in 3 South dayroom.  No injuries.  Complaining about his legs + ankles swelling he seems really confused lethargic . . . ."  Keach Affirm., Nov. 7, 2011, Ex. 68, Dkt. No. 138–18 ("Medical Notes").  C.O. Smith also noted DiCamillo's vitals and her call to N.P. Macri resulting in the discontinuation of the Flexeril.

N.P. Macri testified that she was not aware when contacted by C.O. Smith that DiCamillo had fallen several times, nor was she aware of allegations that DiCamillo had complained about his medication.  She testified that if she was told that DiCamillo was confused and lethargic, she would have thought he hit his head and would have sent him to the hospital.

C.O. Ortlieb was relieved of his duties around 12 p.m. by C.O. Hadsell, who was aware of DiCamillo's prior falls.  C.O. Hadsell was telephoned at 12:32 p.m. by jail staff who advised him to keep an eye on DiCamillo.  Telephone Tr. 79:3.  C.O. Hadsell was told that staff would be discontinuing one of his medications and that he should be monitored closely. Id. 79:22–23. C.O.s observed DiCamillo awake at 2:30 p.m. in his cell.  C.O. Hadsell observed him sleeping on the floor of his cell at 3:30 p.m..  A few minutes before 4:00 p.m., C.O. Hadsell let incoming C.O. Stephen Ferriter into the cell block.  While conducting a head count at the start of his shift, C.O. Ferriter observed DiCamillo lying on the floor of his cell. Upon closer examination, C.O. Ferriter discovered that DiCamillo was not breathing.

He and C.O. Hadsell testified that DiCamillo did not look right, his color was off, his lips were bluish, his skin was pale, and he did not respond when C.O. Ferriter shook him. C.O. Hadsell took his vitals but he had no heartbeat or pulse.  Staff performed CPR and used an automatic external defibrillator on DiCamillo.  A Code Blue was called and a call placed to

911.  At 4:07 p.m. emergency medical services personnel from Mohawk Valley Ambulance Corps arrived to take over care.  They began advanced cardiac care with IV and intubation. The cardiac monitor showed DiCamillo in asystole (flatline) the entire time.  DiCamillo was transported from the jail to the hospital where he was pronounced dead.

### F. <u>New York State Commission of Correction Report</u>

Following DiCamillo's death, the New York State Commission of Correction ("COC") conducted an extensive investigation and concluded that DiCamillo's death was attributed in part "to jail medical personnel who failed to recognize signs of medication overdose." Perkins Aff., July 15, 2011, Ex. V at 2, Dkt. No. 123–26 ("Final Report").  The Final Report concluded that his "death could have been prevented had proper medical intervention been provided when he began showing signs of acute intoxication."  Id.

An autopsy determined DiCamillo's death was due to cardiac arrhythmia caused by an overdose of prescription medications—specifically the combined effects of Venlafaxine (Effexor), Nortriptyline, and Avinza (morphine).  Postmortem toxicology revealed a toxic level of the anti-depressant Venlafaxine (Effexor) in DiCamillo's system.  According to the Final Report, DiCamillo had been prescribed a regimen of Effexor XR 150 mg, four times a day for the past three years by his psychiatrist Dr. Zoppa.  Additionally, DiCamillo's primary care physician, Dr. Sterling, had prescribed the same medication and dosage to DiCamillo at irregular intervals.

For example, Dr. Zoppa wrote DiCamillo a prescription for Effexor XR on April 18, 2005, for a 90 day supply and then not again until February 15, 2006, for another 90 day supply.  A prescription from Dr. Sterling shows DiCamillo being prescribed Effexor XR 150 mg, four times a day, with five refills (a 150 day supply) on April 14, 2006.  According to the

COC, review of DiCamillo's community pharmacy profile revealed that the Effexor XR was being dispensed in amounts half of what was actually written, with 60 pills being given instead of 120.  Further, according to the Final Report, the daily dosage (600 mg) and formulation (XR-extended release) used exceeded accepted therapeutic limits for Effexor as written.  The daily recommended maximum dosage for Effexor is 450 mg and extended release for only once a day administration.  The Final Report concluded that:

> It is apparent that DiCamillo had been instructed to use half the amount of Effexor XR he was prescribed.  However, due to uncoordinated care between his community psychiatrist, Dr. R.Z., and his primary care physician, Dr. S.S., DiCamillo was not adequately monitored for medication compliance and had multiple prescriptions of the same medication.  Upon entering into the Herkimer County Jail, DiCamillo received the dosage of Effexor XR as written by Dr. R.Z. and Dr. S.S. which resulted in an exceedingly elevated loading dose at regimented intervals.

Id. at 6.  The Final Report states that jail medical staff "failed to recognize and take appropriate action when obvious signs of acute toxicity began to appear which ultimately led to DiCamillo's death."  Id. at 6–7.

At the COC's direction, the New York State Education Department, Office of Professional Discipline ("OPD") investigated N.P. Macri's failure to consult with Dr. Handy regarding DiCamillo's extensive proscription regimen.  OPD found N.P. Macri was not responsible for DiCamillo's death and closed its file without issuing any disciplinary action.  The COC also directed OPD to investigate R.N. Fullem's failure to perform an adequate assessment on DiCamillo on three occasions, his failure to recognize obvious signs of acute intoxication, and his failure to properly document his clinical encounters.  OPD disciplined R.N. Fullem for failing to make written records of two of his three evaluations of DiCamillo on Thursday, June 29.

### III.  PROCEDURAL HISTORY

Plaintiff filed this action in January 2008 (and subsequently served an amended complaint in June 2008) against the County defendants and N.P. Macri.[16]  The amended complaint seeks compensatory and punitive damages and attorneys' fees and costs.

N.P. Macri answered plaintiff's amended complaint and asserted cross-claims against the County defendants sounding in indemnity and/or contribution.  The County defendants answered plaintiff's amended complaint and asserted a cross-claim against N.P. Macri sounding in indemnity and/or contribution.  The County defendants answered N.P. Macri's cross-claims, and N.P. Macri answered the County defendants' cross-claim.

The County and Sheriff Farber then filed a third-party complaint against the hospital demanding indemnity pursuant to the terms of the 2006 Agreement.  The hospital answered the third-party complaint and asserted a counter-claim against the County and Sheriff Farber demanding indemnity pursuant to the 2006 Agreement.  The County and Sheriff Farber then answered the hospital's counter-claim.

N.P. Macri and the hospital (the "hospital defendants") moved for summary judgment pursuant to Federal Rule of Civil Procedure 56, dismissing plaintiff's claims and the third-party complaint brought by the County and Sheriff Farber.  Plaintiff opposed.  The County and Sheriff Farber also opposed.  The hospital defendants replied.

---

[16]  The amended complaint also named Undersheriff George Treen, Jr.; C.O. Andrew George; C.O. Sydney Renshaw; C.O. Tiffany Fletcher; C.O. Jared Popiel; and C.O. Stephen Ferriter.  On March 21, 2011, claims against those defendants were discontinued by stipulation of the parties.

The County defendants also moved for summary judgment pursuant to Federal Rule of Civil Procedure 56, dismissing plaintiff's claims.  Plaintiff opposed and the County defendants replied.

## IV.  <u>LEGAL STANDARD—SUMMARY JUDGMENT</u>

Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509–10 (1986).  All facts, inferences, and ambiguities must be viewed in a light most favorable to the non-moving party.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986).

Initially, the burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56; <u>Liberty Lobby, Inc.</u>, 477 U.S. at 250, 106 S. Ct. at 2511.  A fact is "material" if it "might affect the outcome of the suit under the governing law." <u>Anderson</u>, 477 U.S. at 248, 106 S. Ct. at 2510; <u>see also</u> <u>Jeffreys v. City of N.Y.</u>, 426 F.3d 549, 553 (2d Cir. 2005).  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 586, 106 S. Ct. at 1356.  There must be sufficient evidence upon which a reasonable fact finder could return a verdict for the non-moving party.  <u>Liberty Lobby, Inc.</u>, 477 U.S. at 248–49, 106 S. Ct. at 2510; <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 587, 106 S. Ct. at 1356.

## V.  DISCUSSION

### A.  Hospital Defendants' Motion for Summary Judgment

The hospital defendants seek summary judgment dismissing the federal deliberate indifference claim, state law wrongful death claim,[17] and request for punitive damages against N.P. Macri.  They also move to dismiss the third-party complaint brought by the County and Sheriff Farber.

### 1.  Claims against N.P. Macri

### a.  Deliberate Indifference:  Federal Claim

To prevail on a claim under § 1983, a plaintiff must show:  (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law.  42 U.S.C. § 1983.  "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere."  Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993).  There is no dispute for purposes of this motion that defendants acted under color of state law.  The question therefore is whether defendants' alleged conduct deprived DiCamillo and/or plaintiff of their constitutional rights.

A claim for deliberate indifference in this context is properly analyzed under the Fourteenth Amendment.  "A convicted prisoner's claim of deliberate indifference to his medical needs by those overseeing his care is analyzed under the Eighth Amendment because the right the plaintiff seeks to vindicate arises from the Eighth Amendment's prohibition of cruel and unusual punishment."  Caiozzo v. Koreman, 581 F.3d 63, 69 (2d Cir.

---

[17]  The wrongful death claim will be discussed separately.

2009) (internal quotations omitted).  By contrast, in the case of a person such as DiCamillo, being held prior to trial, "the cruel and unusual punishment proscription of the Eighth Amendment to the Constitution does not apply, because as a pre-trial detainee the plaintiff is not being punished." Id. (internal quotations omitted).  Instead, the medical needs of an arrestee detained in state custody prior to conviction are protected by the Due Process Clause of the Fourteenth Amendment. Id.  However, regardless of whether a deliberate indifference claim is brought pursuant to the Eighth or Fourteenth Amendment, the standard is the same. Id. at 72.

    Under the Fourteenth Amendment, the official custodian of an unconvicted detainee may be found liable for violating the detainee's constitutional rights if the official disregarded a risk of harm to the plaintiff of which the official was aware. Id. at 71.  This requires a two prong showing:  (1) that the detainee had a "serious medical condition," (2) which the defendant met with "deliberate indifference." Id. at 72. (internal quotations omitted).  "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." Smith v. Carpenter, 316 F.3d 178, 183–84 (2d Cir. 2003) (citations omitted).

    With regard to the first, objective prong, "the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration or extreme pain exists." Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996) (internal quotations and citation omitted).  When alleged deprivation is that the defendant failed to provide any treatment for the medical condition, "courts examine whether the inmate's medical condition is sufficiently serious." Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir.

2006).  A medical need is serious for constitutional purposes if it presents "a condition of urgency that may result in degeneration or extreme pain." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotations omitted).  A serious medical need can also exist where "failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." Harrison v. Barkley, 219 F.3d 132, 136 (2d Cir. 2000) (internal quotations omitted).  By contrast, when the challenge is to the adequacy of the treatment provided, the seriousness inquiry focuses on "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract." Smith, 316 F.3d at 186.

The second prong is a subjective standard, requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state, that is, with reckless disregard to a known substantial risk of harm. Farmer v. Brennan, 511 U.S. 825, 836, 114 S. Ct. 1970, 1978 (1994).  A plaintiff must prove that the defendant "kn[ew] of and disregard[ed] an excessive risk to [the inmate's] health or safety" and that he or she was "both . . . aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and . . . also dr[e]w the inference." Id. at 837, 114 S. Ct. at 1979.  "'Deliberate indifference' is 'a mental state more blameworthy than negligence'—it is 'a state of mind that is the equivalent of criminal recklessness.'" Kelsey v. City of N.Y., 306 F. App'x 700, 702 (2d Cir. 2009) (summary order) (quoting Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003)).  It need not be shown that the defendant under consideration intended for DiCamillo to suffer harm, but his or her actions must have been more than merely negligent. See Salahuddin, 467 F.3d at 280.  Relevant to this inquiry are questions of fact such as:  what did the defendant know about DiCamillo's symptoms and medical needs; what did he or she know

about the kind of treatment or lack thereof that had already been provided; and what did he or she know about the likely medical consequences of such lack of treatment?  See Hilton v. Wright, 673 F.3d 120, 127 (2d Cir. 2012).

The hospital defendants do not dispute that DiCamillo had a serious medical condition, but contend N.P. Macri did not act with the requisite culpable state of mind.  The question is thus whether a reasonable juror could conclude that N.P. Macri was deliberately indifferent to DiCamillo's condition, which means that she "kn[ew] of and disregard[ed] an excessive risk to [DiCamillo's] health or safety" and that she was "both . . . aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and . . . also dr[e]w the inference."  Farmer, 511 U.S. at 837, 114 S. Ct. at 1979.

It is undisputed N.P. Macri knew of DiCamillo's extensive prescription regimen, as she confirmed his medications with R.N. Urtz upon his arrival at the jail.  Plaintiff contends N.P. Macri failed to independently review his medical records[18] despite her awareness that he was on a large amount of medication.  Following the COC Final Report, no disciplinary action was taken with regard to her failure to consult with Dr. Handy about DiCamillo's medications.  Further, Dr. Handy testified that he did not think she needed to consult with him regarding DiCamillo's prescriptions.

With respect to N.P. Macri's failure to evaluate DiCamillo in person on Thursday, June 29, R.N. Fullem and C.O. Harrod both testified that DiCamillo's inability to walk to the medical unit was communicated in the presence of N.P. Macri, yet she marked his inability as a "refusal."  R.N. Fullem also testified that he advised N.P. Macri that same morning that

---

[18] Plaintiff contends that because N.P. Macri failed to look at the Medication Administration Records, she did not see the numerous medication administration errors.

DiCamillo was having trouble ambulating.  Further, N.P. Macri informed R.N. Fullem that she was going to reduce DiCamillo's medication because he was so "groggy," yet she never contacted a physician to discuss reducing his medication.  However, she testified that she was advised DiCamillo refused to see her on Thursday, June 29, and was never told that DiCamillo could not get up and/or was unable to walk.[19]  She also denies that R.N. Fullem told her that he had observed DiCamillo having difficulty getting up earlier in the day.  The Final Report found that while it was relayed to the nurse's station that DiCamillo could not ambulate to sick call, it was relayed to N.P. Macri that DiCamillo refused to be seen.  The Final Report concluded that "[d]ue to a lack of coordinated communication and policy and procedure for jail medical-security personnel communication, DiCamillo was not seen by the NP for sick call."  Final Report at 4.

As to N.P. Macri's decision not to send DiCamillo to the hospital on Friday, June 30, plaintiff contends she improperly trusted the representations of medically untrained C.O. Smith that DiCamillo did not need to go to the hospital.  Despite C.O. Smith advising her that DiCamillo had fallen, he was "out of it from all of the medicine he's taking," that his legs and ankles were swelling, and that he was "groggy," N.P. Macri decided that DiCamillo did not need further medical attention, and instead directed that one of his medications be discontinued, without ever having assessed him in person.  Dr. Handy testified that, knowing what N.P. Macri knew, he would have sent DiCamillo to the hospital.  Defendants contend that N.P. Macri's decision not to send DiCamillo to the hospital is not actionable, and even if it can be debated as a medical decision, it does not rise to the level of deliberate

---

[19]  Her phone call with C.O. Smith the following day (Friday, June 30) further supports her claim that she believed DiCamillo refused to see her.

indifference.  N.P. Macri testified that she did not know DiCamillo never left his cell the day prior to his death, nor was she aware that he was ever crawling on the floor.  She testified that when C.O. Smith advised her that DiCamillo did not need to go to the hospital, she had no information on which to disagree with C.O. Smith's conclusion.  However, following the issuance of the Final Report, she testified that if she had known the facts conveyed therein, she would have sent DiCamillo to the hospital.

Finally, plaintiff's medical expert, Dr. Robert B. Greifinger, M.D., concluded N.P. Macri's conduct was well below the relevant standard of care and represented deliberate indifference to DiCamillo's serious medical needs.  By contrast, the hospital defendants' medical expert, Dr. Anthony J. Marinello, M.D., Ph.D., concluded that N.P. Macri did not violate her duty of care when she ordered DiCamillo's medication, having been advised that his list of medications had been verified pursuant to jail policy.  Moreover, he concluded that based upon the information N.P. Macri was provided, her failure to personally assess DiCamillo on Thursday, June 29, and her failure to order him transported to the hospital after her telephone conversation with C.O. Smith on Friday, June 30, did not constitute deliberate indifference to DiCamillo's serious medical needs.

Because there is conflicting testimony, there remains an issue of material fact as to whether N.P. Macri was aware of DiCamillo's condition but consciously disregarded the risk of harm to him.  Based on the evidence presented, a reasonable juror could conclude that N.P. Macri "kn[ew] of and disregard[ed] an excessive risk to [DiCamillo's] health or safety" and that she was "both . . . aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and . . . also dr[e]w the inference," Farmer, 511 U.S. at 837, 114 S. Ct. at 1979, and thus summary judgment is inappropriate.  Accordingly,

the hospital defendants' motion on this ground will be denied and plaintiff's claim for deliberate indifference against N.P. Macri will remain for trial.

**b.  Punitive Damages**

"A jury may 'assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" DiSorbo v. Hoy, 343 F.3d 172, 186 (2d Cir. 2003) (quoting Smith v. Wade, 461 U.S. 30, 56, 103 S. Ct. 1625 (1983). N.P. Macri argues any alleged conduct by her does not approach the threshold required for permitting punitive damages.

As with the deliberate indifference claim against her, there are disputed issues of fact central to whether N.P. Macri's conduct "involves reckless or callous indifference to the federally protected rights" of DiCamillo. See id. Accordingly, summary judgment dismissing the request for punitive damages will be denied.

**2.  Third-Party Complaint against the Hospital**

The Little Falls Hospital contends the third-party complaint against it must be dismissed because the 2006 Agreement in no way establishes an agency relationship between the hospital and the County. Further, neither party assumed any liability for the acts of the other, and there is no evidence that the hospital played a role with respect to any County policies.

The County and Sheriff Farber oppose and explain that N.P. Macri and Dr. Handy were appointed by the Legislature, and jail officials (with no medical training) rely upon them in carrying out the jail's medical operations and policies. Thus, if a jury found that a medically-related County or jail policy caused DiCamillo's death, the County defendants'

position is that N.P. Macri would be responsible and any award for damages would be subject to indemnification by the hospital pursuant to the 2006 Agreement.

The hospital's motion for summary judgment is premature as no liability has yet been found.  The motion will therefore be denied without prejudice.  Further, a district court has broad discretion, on motion or on its own, to add or drop a party or sever any claim against a party.  Fed. R. Civ. P. 21.  A court may exercise this right "[f]or convenience, to avoid prejudice, or to expedite and economize."  Fed. R. Civ. P. 42(b).  A separate trial regarding indemnity—following any jury verdict on liability—would be both economical and convenient. Accordingly, pursuant to Rule 42(b), the third-party action will be severed from the main action.

### B.  County Defendants' Motion for Summary Judgment

The County defendants seek summary judgment dismissing the federal deliberate indifference claim, the federal due process claim, and the state law wrongful death claim.[20] In the alternative, they argue the County defendants are entitled to qualified immunity.

### 1.  R.N. Urtz

The claims against R.N. Urtz will be addressed first.  Plaintiff asserts in his opposition papers that he agreed to discontinue this action against R.N. Urtz if defendants confirmed she was not a policymaker.  At oral argument, counsel for the County defendants conceded such.  However, plaintiff has not filed a stipulation of discontinuance as to the claims against R.N. Urtz.

---

[20]  The due process and wrongful death claims will be discussed separately.

The personal involvement of a defendant is an essential element of a § 1983 claim. Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994).  "A plaintiff must thus allege a tangible connection between the acts of a defendant and the injuries suffered."  Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986).  After her initial assessment of DiCamillo on Friday, June 23, R.N. Urtz was away on vacation and did not return to the jail until July 10, 2006.  She was not involved in any of the conduct which allegedly violated DiCamillo's constitutional rights. Further, it is undisputed she is not a policymaker and thus cannot be liable for any unconstitutional policies of the County, should they be found.

Accordingly, R.N. Urtz will be dismissed as a defendant in this lawsuit.

### 2.  **Deliberate Indifference**:  **Federal Claim**

The County defendants argue the deliberate indifference claims should be dismissed because DiCamillo did not suffer from a serious medical condition at the time of his incarceration.  They contend that none of his health conditions were new to him and he was provided his prescribed drugs as listed.  Finally, they assert that any dispute over DiCamillo's treatment is merely a disagreement over medical decisions, and does not rise to the level of deliberate indifference.

When DiCamillo arrived at the jail, he presented with a past history of depression, anxiety, tachycardia, angina, mitral valve prolapsed, degenerative back disease, and sciatic nerve.  He was on numerous prescription medications for these conditions.  Further, while detained, he began showing signs of drug intoxication, including sweating profusely, confusion, sudden falling, being unable to stand on his own, and extreme lethargy.  Plaintiff has offered substantial evidence to satisfy the objective element of deliberate indifference because the alleged deprivations—particularly the failure to notice symptoms of drug

intoxication and the failure to provide DiCamillo medical treatment—were "sufficiently serious" deprivations, creating a risk of "death, degeneration, or extreme pain."  Hathaway, 99 F.3d at 553.  Having concluded that summary judgment may not be granted to the County defendants on the ground that DiCamillo's medical condition was not sufficiently serious, the subjective awareness of each defendant must be considered.

### a. R.N. Fullem

Plaintiff contends R.N. Fullem's conduct was the most reprehensible in that he either failed to recognize DiCamillo's symptoms or ignored them.

Defendants contend that R.N. Fullem adequately provided care to DiCamillo on each of the three occasions he was called to DiCamillo's cell block on Thursday, June 29.  Further, each time he assessed DiCamillo, DiCamillo assured him he was okay and was feeling normal.  R.N. Fullem repeatedly testified that had he thought DiCamillo was not stable; that he was in a medical emergency; or that he was experiencing a drug overdose, he would have sent him to the hospital.  He also testified that if DiCamillo's condition was something he thought required N.P. Macri's attention, he would have called her.  Defendants contend that even if R.N. Fullem should have known DiCamillo was suffering from a drug overdose, or should have done more, there is no evidence that R.N. Fullem was actually aware of immediate danger to DiCamillo, and thus no reasonable juror could conclude that the Farmer test has been met.

However, inmates in DiCamillo's housing unit testified that it was obvious that DiCamillo was sweating, lethargic, and barely able to speak on Thursday, June 29.  R.N. Fullem testified that he reviewed one of DiCamillo's sick slips which stated he was not receiving the right medications.  He was also aware that N.P. Macri planned on reviewing

DiCamillo's medications and possibly decreasing or discontinuing some of them because DiCamillo was "so groggy."  Further, R.N. Fullem was aware of DiCamillo's extensive pharmacy regimen, and personally assessed him as suffering from "lethargy" and an "altered level of consciousness" on the Med 6 form.  Despite this, R.N. Fullem thought DiCamillo was fine and was manipulating staff.  Finally, despite learning of an inconsistency in DiCamillo's prescriptions when he called to confirm them with the local pharmacy, R.N. Fullem inquired no further.

Moreover, while in no way dispositive, plaintiff's medical expert Dr. Greifinger concluded R.N. Fullem's conduct represented callous disregard for DiCamillo's serious medical needs and that he was deliberately indifferent.  Further, the Final Report by the COC concluded that R.N. Fullem failed to recognize obvious signs of acute intoxication.  By contrast, the County's expert, Dr. Michael G. Holland, M.D., concluded that none of the jail staff deviated from the standard of care nor were deliberately indifferent to DiCamillo's serious medical needs.

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence."  Farmer, 511 U.S. at 842, 114 S. Ct. at 1981 (citations omitted).  "Although Farmer requires that a plaintiff prove actual knowledge of a risk, evidence that the risk was obvious or otherwise must have been known to a defendant is sufficient to permit a jury to conclude that the defendant was actually aware of it."  Brock v. Wright, 315 F.3d 158, 164 (2d Cir. 2003) (citing Farmer, 511 U.S. at 842, 114 S. Ct. at 1981).  Plaintiff may present evidence demonstrating that a substantial risk to DiCamillo's health was

longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and [if] the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

Farmer, 511 U.S. at 842, 114 S. Ct. at 1981 (internal quotations omitted).

There is testimony that DiCamillo was in obvious serious distress. That testimony, coupled with R.N. Fullem's own training and experience as a registered nurse, plus his awareness of DiCamillo's complaints, sick slips, and extensive prescription regimen, could cause a reasonable juror to conclude that R.N. Fullem "kn[ew] of and disregard[ed] an excessive risk to [DiCamillo's] health or safety" and he was "both . . . aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and . . . also dr[e]w the inference." Id. at 837, 114 S. Ct. at 1979.

R.N. Fullem may demonstrate "that the obvious escaped him," but he "[can]not escape liability if the evidence show[s] that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." Id. at 843 n.8, 114 S. Ct. at 1982. However, he may present evidence that he "did not know of the underlying facts indicating a sufficiently substantial danger" and was thus unaware of the danger, or that he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." Id. at 844, 114 S. Ct. at 1982. R.N. Fullem's belief that his conduct posed no risk of serious harm to DiCamillo "need not be sound so long as it is sincere . . . even if objectively unreasonable, a defendant's mental state may be nonculpable." Salahuddin, 467 F.3d at 281.

Accordingly, summary judgment will be denied and the deliberate indifference claim against R.N. Fullem will remain for trial.

**b.  C.O. Ortlieb and C.O. Smith**

Plaintiff contends C.O. Ortlieb observed DiCamillo fall repeatedly but did nothing more than summon C.O. Smith.  Further, in light of DiCamillo's deteriorating condition, plaintiff contends C.O. Smith should have sent DiCamillo to the hospital but instead failed to do anything more than place a phone call to N.P. Macri.

C.O. Ortlieb testified that he did not see fall DiCamillo fall the first two times on Friday, June 30, and when he did witness a later fall, he appropriately contacted medical personnel.  C.O. Smith contends she performed her duties as a medical officer in accordance with jail policies and followed N.P. Macri's instructions precisely.

Even assuming for purposes of this analysis that C.O. Ortlieb knew of an excessive risk to DiCamillo's safety, there is no evidence upon which a reasonable juror could conclude that he disregarded such a risk.  Instead, the record shows that C.O. Ortlieb had very limited personal involvement with DiCamillo.  When he witnessed DiCamillo fall at approximately 11:40 a.m., he assisted him and promptly contacted the medical unit.  C.O. Smith then arrived to check on DiCamillo.

With respect to C.O. Smith, there is no direct evidence that she was aware of and disregarded an excessive risk to DiCamillo's health.  However, the existence of such culpable state of minds are "question[s] of fact subject to demonstration in the usual ways, including inference from circumstantial evidence."  Farmer, 511 U.S. at 842, 114 S. Ct. at 1981.  As with the claim against R.N. Fullem, there is testimony that the risk to DiCamillo's health was so obvious that C.O. Smith must have been aware of it upon assessing him that morning.  She learned that DiCamillo had fallen, had swollen ankles, and had an elevated heart rate and blood pressure.  It is up to a jury to determine which testimony to credit and thus decide

whether C.O. Smith "did not know of the underlying facts indicating a sufficiently substantial danger" and was thus unaware of the danger, or that she "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent."  Id. at 844, 114 S. Ct. at 1982.  There is also evidence upon which a reasonable juror could find that C.O. Smith disregard such a risk.  Instead of ordering DiCamillo sent to the hospital, she called N.P. Macri and advised that DiCamillo did not need to go to the hospital.

For these reasons and those explained above, summary judgment as to C.O. Ortlieb will be granted and the deliberate indifference claim against him dismissed.  Summary judgment as to C.O. Smith will be denied and the deliberate indifference claim against her will remain for trial.

### c. <u>Herkimer County</u>

Plaintiff alleges the County had an affirmative policy as well as an informal practice of having untrained C.O.s administer medications in the absence of appropriate supervision from trained medical personnel.  Plaintiff also asserts the County had an informal practice of refusing to provide adequate nursing coverage at the jail and did not have appropriate policies for inmate medical care.  The County defendants contend they are entitled to summary judgment dismissing this claim because plaintiff has failed to set forth any allegations that would support the existence of an unconstitutional policy, custom, or practice on the part of the County that would have caused any of the alleged § 1983 violations purportedly suffered by plaintiff and the decedent.  Further, the County argues that plaintiff's reliance upon the isolated events of this case is insufficient to establish a custom, policy, or practice.

In order to hold a municipality liable under § 1983, a plaintiff must show the constitutional violation was caused by (1) a municipal policy, (2) a municipal custom or practice, or (3) the decision of a municipal policymaker.  Monell v. Dep't of Soc. Servs. of N.Y.C., 436 U.S. 658, 694, 98 S. Ct. 2018, 2037–38 (1978).  Furthermore, the plaintiff must demonstrate that the municipality, through deliberate conduct, was the moving force behind the injury.  Id., 98 S. Ct. at 2038.  Thus, the plaintiff must establish a casual link between the municipal action and the deprivation of rights.  Id.

A municipality may be held responsible for its express written policies if those written policies violate the constitution, and result in someone's injury.  Id. at 690, 98 S. Ct. at 2036. "[A]lleging that a municipal policy or ordinance is itself unconstitutional is always sufficient to establish the necessary causal connection . . . because an employee's act of enforcing an unconstitutional municipal policy may be considered the act of the municipality itself." Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 125 (2d Cir. 2004).  Further, a municipality can be found to have a custom that causes a constitutional violation when it is "faced with a pattern of misconduct and does nothing, compelling the conclusion that [it] . . . has acquiesced in or tacitly authorized" the misconduct.  Reynolds v. Giuliani, 506 F.3d 183, 192 (2d Cir. 2007).

First, plaintiff alleges the policy cross-designating C.O.s as medical officers is unconstitutional on its face, or in the alternative, unconstitutional as applied by the County. Plaintiff asserts that medical officers with no medical training took the place of nurses, made medical assessments, and dispensed medication.  The jail's medical policy states:

> On every shift there will be at least one Deputy serving as the Medical Officer.
> This Deputy has received training in limited aspects of health care as
> determined by the facility physician. The Medical Officer maintains close

liaisons with the Nurse and Physician. He/she is responsible for distributing medication as directed by the physician or his designee. The Medical Officer serves as a health service provider at the times when the Nurse and/or physician are not present.

Keach Affirm., Ex. 122.  The policy further provides:

Deputies used as Medical Officers require significant training to administer medications and maintain health service orders directed by the facility physician and/or his designees. . . . The Medical Officer training course will be an 8 hour in-service training session. The Nurse will instruct this class following the approved curriculum. . . . There will also be a schedule maintained by the nurse for an annual refresher course for those Deputies receiving the initial course. This annual course will be a 4 hour class. . . . Documentation for all health care provider training both initial and on-going is maintained in the Undersheriff's Office.

Id.  The training consisted of a C.O. shadowing a medical officer and the nurse to learn how to dispense medications, read notations, collect inmates' medications from the medication cart and fill them into cups to administer to inmates, and learning how to go through medication sheets.  C.O.s received no training on the signs of drug overdose, drug interactions, or pharmaceuticals.

It is undisputed that, as in many facilities, C.O.s at the jail deliver medications to inmates when there is no nursing staff on duty.  According to COC Investigator Christopher Ost, that delivery is an approved practiced.[21]  Defendants argue that C.O. Smith is the only remaining defendant who, as a medical officer, distributed medications to DiCamillo and that plaintiff cannot prove the medical officer policy caused the alleged violation of DiCamillo's rights.

---

[21]  Prior to DiCamillo's death, the COC issued a Chairman's Memorandum specific to the delivery of medications by C.O.s.  According to Investigator Ost, C.O.s can provide medications to inmates provided that the medication is in a "single unit dose packaging," that is, C.O.s are not allowed to measure out any quantity of medication to be delivered.

In addition to dispensing medications, medical officers are responsible for assisting the nurse in performing the nurse's duties.  For example, the medical officer will accompany the nurse for safety reasons if the nurse has to go into the facility to see an inmate.  Medical officers are also responsible for going to the cell blocks and bringing inmates that need to be seen by the nurse to the medical unit.  If a medical issue arises regarding an inmate while there is no medical staff at the jail, it is the responsibility of the medical officer to gather information about the problem and then contact a R.N. or the N.P..  N.P. Macri testified that medical officers perform basically the same tasks as Licensed Practicing Nurses.

According to defendants, medical officers do not perform medical assessments.  R.N. Urtz testified that C.O.s are trained to operate a simple automatic digital blood pressure monitor, similar to those available at drug stores for self-use.  Once the cuff is attached to the arm of an inmate, the C.O. need only press a start button.  The machine then provides a digital readout of the inmate's blood pressure and heart rate, which is then transcribed and provided to the R.N. or N.P..

The Final Report following DiCamillo's death concluded that DiCamillo started to show signs of intoxication which were not recognized, that C.O. Smith (who was unqualified to do so) conducted a medical assessment when DiCamillo was exhibiting these symptoms, and that her assessment was then relayed to N.P. Macri.  The Final Report recommended that the jail immediately discontinue the practice of utilizing officers designated as medical officers to conduct medical assessments and interpret medical data.  Despite the COC's criticism, defendants contend that C.O. Smith's assessment played no role in DiCamillo's death and plaintiff therefore cannot establish a causal connection between this practice and the alleged constitutional violation.

- 42 -

Further, plaintiffs allege there was a shortage of nursing coverage at the jail at the time of DiCamillo's death.  At that time—in June 2006— R.N. Urtz and R.N. Fullem both worked at the jail on a part-time basis, up to twenty hours each per week.  N.P. Macri was also in the facility each Thursday or as needed.  According to R.N. Urtz, efforts were being made in 2006 to replace the full-time nurse that left the facility in 2005.  In September 2006, R.N. Urtz accepted the full-time nursing position at the jail.  Investigator Ost testified that jail facilities are not required to have round-the-clock nursing staff in a facility, however, he opined that the COC's minimum standards and medical staffing requirements would call for at least one full-time equivalent nursing position at the jail.  Further, there must be one full-time equivalent position available for coverage.  How that is achieved—whether through one full-time person or a series of part-time people—is up to the County.

It is undisputed that nursing staff was only present in the jail for one of out five days during the five days before DiCamillo died.  Defendants argue plaintiffs cannot establish a causal link between any nursing shortage and DiCamillo's death because as of Wednesday, June 28, when he left the jail for a criminal court appearance, he exhibited no symptoms of drug toxicity nor complained of any problems.  For the two remaining days that DiCamillo was at the jail, defendants assert there was adequate nursing coverage by R.N. Fullem on Thursday, June 29, from approximately 8:00 a.m. until 2:00 or 3:00 p.m., and R.N. Fullem assessed DiCamillo on three separate occasions.  N.P. Macri was also present at the facility. Finally, on Friday, June 30, N.P. Macri was on call and C.O. Smith worked as a medical officer.  Defendants argue that plaintiff cannot establish that the absence of a medical professional resulted in a lack of attention to DiCamillo's medical needs.

Lastly, the Final Report recommended that the jail "[d]evelop policy and procedures for the delivery of medical services for the jail, including but not limited to nursing protocols, nursing sick call, doctor sick call, emergencies, on-call procedures, medication procedures, medical refusals and communication/coordination between security and medical staff."  Final Report at 7.

There is sufficient evidence in the record for a rational trier of fact to conclude that a policy or custom of the County led to the denial of medical treatment.  Accordingly, defendants' motion for summary judgment will be denied with respect to the County's municipal liability.

### d. __Personal Involvement of Sheriff Farber, Cpt. McGrail, and Lt. Coddington__

Sheriff Farber, Captain McGrail, and Lt. Coddington argue they must be dismissed because they were not personally involved in any of the alleged constitutional violations.

The personal involvement of a defendant is an essential element of a § 1983 claim. Wright, 21 F.3d at 501.  Moreover, a plaintiff must "allege a tangible connection between the acts of a defendant and the injuries suffered." Bass, 790 F.2d at 263.  However, a supervisor cannot be held liable simply by being a supervisor because there is no respondeat superior liability under § 1983.  See Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003) (per curiam).  Instead, supervisory liability may attach under the following circumstances: "(1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were

occurring." Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003) (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)).

There is some debate as to whether all five Colon categories of supervisor liability remain available after the United States Supreme Court's decision in Ashcroft v. Iqbal, 556 U.S. 662, 676–77, 129 S. Ct. 1937, 1948–49 (2009). See Reynolds v. Barrett, 685 F.3d 193, n.14 (2d Cir. 2012) (noting considerable skepticism on whether all Colon factors survived Iqbal but not deciding the issue); McCarroll v. Fed. Bureau of Prisons, No. 9:08-CV-1343, 2010 WL 4609379, at *4 (N.D.N.Y. Sept. 30, 2010) (Lowe, M.J.) (noting that although the Second Circuit has not yet addressed Iqbal's impact on the five Colon categories, several district courts have determined that it nullified some categories); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing with interpretations that Iqbal eliminated all but the first and third Colon categories), aff'd, 462 F. App'x 79 (2d Cir. 2012).

Plaintiff's allegations against these policymaker defendants fit squarely within the third Colon category permitting liability based on a supervisor's creation of "a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom." Colon, 58 F.3d at 873. Plaintiff claims that Sheriff Farber, Cpt. McGrail, and Lt. Coddington promulgated and allowed unconstitutional policies and customs to occur and continue, such as the medical officer policy and the under staffing of nurses at the jail.

Sheriff Farber testified that he does not supervise the jail, and his day-to-day duties as County Sheriff do not involve the policies and procedures of the jail. According to him, Cpt. McGrail develops policies and procedures for the jail. Cpt. McGrail testified that he is responsible for the policies and procedures of the jail, and that Sheriff Farber reviews and signs off on those policies. He also testified that Sheriff Farber is responsible for the contract

between the County and Little Falls Hospital.  Further, as part of their role through that contract, N.P. Macri and Dr. Handy advise the County regarding jail medical policies and procedures.  Then, after those policies are signed off on by Dr. Handy and Sheriff Farber, Cpt. McGrail and his staff implement them at the jail.  Because there is testimony regarding both Sheriff Farber and Cpt. McGrail's involvement in promulgating and implementing the allegedly unconstitutional policies and practices at the jail, summary judgment is inappropriate and defendants' motion to dismiss Sheriff Farber and Cpt. McGrail will be denied.

Lt. Coddington testified that at the time of DiCamillo's death, he was responsible for the booking of inmates and ensuring enforcement of rules and regulations governing the security, conduct, discipline, and safety of the inmates and staff at the jail.  He had no responsibility for setting jail policy, nor was he responsible for supervising personnel in the medical unit.  The only involvement Lt. Coddington had with DiCamillo was regarding his request for a cane.  That is wholly unrelated to any allegations of deliberate indifference to DiCamillo's medical needs.

Plaintiff also contends defendants failed to act on information indicating that unconstitutional acts were occurring, and thus Sheriff Farber, Cpt. McGrail, and Lt. Coddington are liable for the alleged constitutional violations under the fifth Colon basis of supervisor liability.  Specifically, plaintiff alleges that these policymakers were well aware of the problems with medical care at the jail but chose to ignore them.  The record establishes that Dr. Handy and N.P. Macri both complained to Sheriff Farber and Cpt. McGrail about inadequate nursing coverage at the jail and expressed their concerns that inadequate coverage could lead to harm to an inmate.  Sheriff Farber and Cpt. McGrail acknowledged

these concerns but no effort was made to seek additional nursing coverage or funding for medical care at the jail.  Further, Dr. Handy and several C.O.s complained to Sheriff Farber and Cpt. McGrail regarding the use of C.O.s to dispense medications.  Because there is evidence that Sheriff Farber and Cpt. McGrail failed to act on information indicating that unconstitutional acts were occurring, summary judgment dismissing them is inappropriate and their motion will be denied.

By contrast, there is no evidence that Lt. Coddington failed to act on such information because he was not a policymaker.  Instead, the evidence establishes that he was responsible for jail security and had no involvement in medical policies and procedures. While N.P. Macri expressed her concern on at least one occasion to Lt. Coddington regarding the nursing shortage, it is clear that Lt. Coddington had absolutely no authority regarding hiring at the jail and thus he cannot be liable as a policymaker under Colon.

Plaintiff alleges conduct that fits within both the third and fifth Colon categories.  Thus, even if it were to be decided that only the first and third Colon bases for supervisor liability survived Iqbal, plaintiff has set forth sufficient evidence upon which a rational trier of fact could conclude that Sheriff Farber and/or Cpt. McGrail created a policy or custom, and/or allowed that policy or custom to continue, which sanctioned conduct amounting to a constitutional violation.  Accordingly, plaintiff has established defendant Sheriff Farber and Cpt. McGrail's personal involvement, and summary judgment on this basis will be denied. However, because Lt. Coddington was not a policymaker and was not involved in any direct constitutional violations, summary judgment will be granted and all claims against him will be dismissed.

### e. **Qualified Immunity**

Having determined that the federal deliberate indifference claims will proceed to trial against County defendants R.N. Fullem, C.O. Smith, Sheriff Farber, and Cpt. McGrail, it must now be determined whether those individual defendants are nonetheless entitled to qualified immunity as a matter of law.[22]  The County defendants argue that, notwithstanding plaintiff's evidence, they are entitled to qualified immunity because they followed jail policies (regarding the confirmation of prescriptions, administration of medications, and medical officer duties); responded to DiCamillo's complaints; and reasonably believed the medical attention and treatment they provided was sufficient in light of DiCamillo's condition at the time.

The doctrine of qualified immunity protects state actors from liability if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callhan, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009).  Even if the rights are clearly defined, "qualified or good faith immunity might still be available as a bar to a plaintiff's suit if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991).  "[A] pretrial detainee's right not to be recklessly denied treatment for a serious medical condition was 'clearly established' at the time these events transpired." Mills v. Fenger, 216 F. App'x 7, 11 (2d Cir. 2006) (summary order).  However, County defendants R.N. Fullem, C.O. Smith, Sheriff Farber, and Cpt. McGrail may still be entitled to qualified immunity if it was objectively reasonable for these defendants to believe that their acts did not violate DiCamillo's rights.

---

[22] Defendant N.P. Macri did not move for dismissal based upon qualified immunity.  However, even if she had, the result would be the same and she would not be entitled to qualified immunity as a matter of law.

These individual County defendants have failed to set forth undisputed evidence that establishes they are entitled to qualified immunity as a matter of law.  Instead, there are disputed issues of fact that must be resolved by a jury in order to determine whether qualified immunity would be warranted.  Accordingly, the remaining individual defendants' motion for summary judgment based on qualified immunity will be denied.

### C.  Violation of Due Process[23]:  Federal Claim

The Due Process Clause of the Fourteenth Amendment contains both a procedural and substantive component.  Zinernon v. Burch, 494 U.S. 113, 125, 110 S. Ct. 975, 983 (1990).  The procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property . . . without due process of law."  Id. (internal quotations omitted) (emphasis in original).  A procedural due process inquiry entails two issues:  (1) "whether there exists a . . . property interest of which a person has been deprived," and if so, (2) "whether the procedures followed by the State were constitutionally sufficient."  Oneida Indian Nation of N.Y. v. Madison Cnty., 665 F.3d 408, 428 (2d Cir. 2011) (internal quotations omitted).

"Property interests are not created by the Constitution, but are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.  Id. at 428 (internal quotations omitted).  "In order to have an interest protectable under the Constitution, a person must have a 'legitimate claim of entitlement to it.'"  Abramson v. Pataki, 278 F.3d 93, 99 (2d Cir. 2002) (quoting Bd. of

---

[23]  While the complaint does not indicate whether the due process claim is one for procedural or substantive due process, the allegations and plaintiff's subsequent arguments make clear that the claim is one for a violation of procedural due process.

Regents of State Coll. v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709 (1972)).
Accordingly, it must be determined whether plaintiff Gabriel possessed, as an individual, a
property interest which he was deprived of, and if so, whether the procedures followed by the
state were constitutionally sufficient.

Plaintiff asserts he lived with his half brother DiCamillo for several years and was his
best friend and companion.  Based on these facts, he contends he had a property and liberty
interest in his relationship with his brother.  He alleges that defendants, by killing DiCamillo,
deprived him of this relationship and violated his due process rights.[24]  Plaintiff has not
identified any source which provides him a constitutionally protected property interest in a
continued relationship with his brother.  Accordingly, his claim for a violation of procedural
due process must fail.

Nor can this cause of action survive if styled as a derivative claim.  A claim by Gabriel
this his brother's constitutional rights were violated is without merit.  Section 1983 does not
recognize a claim on behalf of one person arising from a violation of another person's rights.
See e.g., Kreutzberg v. Cnty. of Suffolk, No. 04–CV–3835, 2006 WL 3370351, at *4
(E.D.N.Y. Nov. 20, 2006) (dismissing a claim for loss of consortium pursuant to § 1983 and
noting that although "the Second Circuit has not ruled on whether a claim for loss of
consortium can be brought under Section 1983 . . . all four Second Circuit district courts and
the Sixth Circuit have found that a loss of consortium claim is a derivative claim that is not
cognizable under Section 1983.").

---

[24]  There is no claim here that DiCamillo himself was deprived of due process by any of the
defendants.

Therefore the County defendants' motion for summary judgment dismissing the Second (Violation of Due Process) Cause of Action will be granted.  While N.P. Macri did not move for summary judgment on this cause of action, this claim will sua sponte be dismissed against her for the reasons explained above.

### D.  Wrongful Death:  State Claim

To succeed on a cause of action to recover damages for wrongful death under New York law, a plaintiff must establish the following elements:  "(1) the death of a human being, (2) the wrongful act, neglect or default of the defendant by which the decedent's death was caused, (3) the survival of distributees who suffered pecuniary loss by reason of the death of decedent, and (4) the appointment of a personal representative of the decedent."  See Chong v. N.Y.C. Tr. Auth., 83 A.D.2d 546, 547 (N.Y. App. Div. 2d Dep't 1981); see also Cragg v Allstate Indem. Corp., 17 N.Y.3d 118, 121 (2011) ("[A] wrongful death action belongs to the decedent's distributees and is designed to compensate the distributees themselves for their pecuniary losses as a result of the wrongful act.") (internal quotations omitted); N.Y. Est. Powers & Trusts § 5–4.1.

With respect to establishing a wrongful act or neglect on behalf of the defendants which caused his death, the complaint appears to allege negligence in terms of the non-medical defendants (County employees), and medical malpractice in terms of defendants N.P. Macri and R.N. Fullem.  To establish ordinary negligence under state law, a plaintiff must prove three elements:  "'(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.'"  Alfaro v. Wal–Mart Stores, Inc., 210 F.3d 111, 114 (2d Cir. 2000) (quoting Akins v. Glens Falls City Sch. Distr., 424 N.E.2d 531, 535, 53 N.Y.2d 325, 333 (1981)).  To establish medical malpractice under

state law, a plaintiff must demonstrate that:  (1) medical staff departed from accepted

standards of medical practice and (2) the departure was the proximate cause of DiCamillo's

death.  See Arkin v. Gittleson, 32 F.3d 658, 664 (2d Cir. 1994).  With respect to the third

element in a state law wrongful death action, "[a] distributee is a person entitled to take or

share in the property of a decedent under the statutes governing descent and distribution."

N.Y. Est. Powers & Trusts § 1–2.5.  Pecuniary loss includes medical and funeral expenses of

the decedent paid by the distributee.  Id. § 5–4.1.

        There is no dispute that DiCamillo is deceased or that a personal representative was

appointed.  Given that there exist genuine issues of material fact regarding whether the

remaining defendants were deliberately indifferent to DiCamillo's medical needs, the only

other issue remaining is whether there are distributees who suffered pecuniary loss by

reason of DiCamillo's death.

        To defeat a motion for summary judgment in a wrongful death case, a plaintiff must

offer proof of pecuniary loss.  Gonzalez v. N.Y.C. Housing Auth., 572 N.E.2d 598, 601, 77

N.Y.2d 663, 668 (1991).  Gabriel contends the Estate accrued funeral expenses; the County

sought reimbursement for medical expenses paid on DiCamillo's behalf; and the County

defendants have not considered DiCamillo's conscious pain and suffering.  However, Gabriel

has not submitted any evidence of these expenses.  To the contrary, he testified that no

expenses were incurred; the County paid for DiCamillo's funeral expenses (and whatever

was left on the balance was paid by DiCamillo's father) and plaintiff has not received any bills

from the hospital.  See Perkins Aff., July 15, 2011, Ex. G at 56:21–57:5, Dkt. No. 123–8 ("50-

H Tr.").  Any alleged pain and suffering by DiCamillo does not qualify as pecuniary loss to a

distributee.  See Cragg, 17 N.Y.3d at 121 ("[A] claim for conscious pain and suffering

belongs to the estate of the deceased, rather than the distributees.") (citing <u>Heslin v. Cnty. of Greene</u>, 923 N.E.2d 1111, 1116 , 14 N.Y.3d 67, 76–77 (2010)).[25]

Accordingly, defendants' motions for summary judgment dismissing the <u>Third</u> (State Law Wrongful Death) Cause of Action will be granted and the claim dismissed as to all defendants.

## VI.  <u>CONCLUSION</u>

Plaintiff has put forth sufficient evidence to raise an issue of material fact as to whether N.P. Macri's conduct constituted deliberate indifference to DiCamillo's medical needs.  For the same reasons, the request for punitive damages against her will remain.  The hospital's request to dismiss the third-party complaint brought by the County is premature as liability between the County defendants and the hospital defendants has not yet been determined.  The motion will therefore be denied without prejudice, and the third-party action will be severed in the interests of convenience and judicial economy.

Next, all claims against R.N. Urtz will be dismissed because she is not a policymaker and was not personally involved in any of the alleged constitutional violations.  The deliberate indifference claims however will remain against R.N. Fullem and C.O. Smith because there are disputed issues of fact as to whether these defendants knew of and disregarded an excessive risk to DiCamillo's health or safety and were both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and also drew that

---

[25]  The complaint does not include a state law claim for DiCamillo's conscious pain and suffering pursuant to New York's survival statute, section 11–3.2 of the Estates, Powers, and Trusts Law.  That section provides:  "No cause of action for injury to person or property is lost because of the death of the person in whose favor the cause of action existed."  <u>Id</u>.  It permits a personal representative of the decedent, such as the plaintiff Gabriel, as Administrator of DiCamillo's Estate, to bring or continue an injury action.  As noted, he has failed to bring such a state action.

inference.  The deliberate indifference claim against C.O. Ortlieb will be dismissed because there are no facts upon which a rational trier of fact could conclude that C.O. Ortlieb disregarded any excessive risk to DiCamillo's health or safety.

Plaintiff has also put forth evidence to establish that DiCamillo's alleged constitutional deprivation was caused by a municipal policy and/or a municipal custom.  Accordingly, the County may be liable under Monell and summary judgment dismissing it as a defendant will be denied.  Further, the record establishes that Sheriff Farber and Cpt. McGrail are policymakers and may thus be liable under § 1983 despite a lack of direct involvement in the alleged constitutional deprivation.  Lt. Coddington however will be dismissed as a defendant because he was not a policymaker nor personally involved in any of the relevant conduct.

Moreover, the County defendants' motion for qualified immunity as to those remaining individual defendants will be denied because they have failed to set forth undisputed evidence that establishes they are entitled to qualified immunity as a matter of law.

The federal due process claim brought individually by Gabriel must be dismissed because he did not have a protected property interest in DiCamillo's life or in his relationship with his half brother.  Finally, the state law wrongful death claim will be dismissed because plaintiff has not offered proof of any pecuniary loss to the decedent's distributees.

Therefore, it is

ORDERED that

1.  Defendant Nurse Practitioner Charlene Macri's motion for summary judgment is GRANTED in part and DENIED in part;

2.  Defendants County of Herkimer; Christopher Farber; Thomas McGrail; L. T. Coddington; Registered Nurse Shannon Urtz; Registered Nurse Chris Fullem; Corrections

Officer Michael Ortlieb; and Corrections Officer Joan Smith's motion for summary judgment is GRANTED in part and DENIED in part;

    3.  The complaint as against defendants Registered Nurse Shannon Urtz; Corrections Officer Michael Ortlieb; and L. T. Coddington is DISMISSED;

    4.  The <u>Second</u> (Violation of Due Process) Cause of Action is DISMISSED as to all defendants;

    5.  The <u>Third</u> (State Law Wrongful Death) Cause of Action is DISMISSED as to all defendants;

    6.  Third-party defendant Little Falls Hospital's motion for summary judgment dismissing the third-party complaint is DENIED without prejudice; and

    7.  The third-party complaint is SEVERED from the main action.

    IT IS SO ORDERED.

_____
United States District Judge

Dated:  September 6, 2012
      Utica, New York.

**The following claims remain for trial in the main action**:

    The <u>First</u> (Deliberate Indifference) Cause of Action as against defendants Nurse Practitioner Charlene Macri; County of Herkimer; Christopher Farber; Thomas McGrail; Registered Nurse Chris Fullem; and Corrections Officer Joan Smith.

    The third-party complaint and counter-claim relating to the 2006 Agreement will be resolved after trial of the main action.